UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

Beatrice Munyenyezi,
      Petitioner

   v.                                    Case No. 16-cv-402-SM
                                         Opinion No. 2019 DNH 178
United States of America,
      Respondent

**O R D E R**

In 2010, a grand jury charged Beatrice Munyenyezi with having unlawfully procured citizenship or naturalization, in violation of 18 U.S.C. § 1425(a) (Count One) and 1425(b) (Count Two). In February of 2013, a petit jury convicted her on both counts. She was sentenced to concurrent terms of imprisonment of 120 months and, pursuant to 8 U.S.C. § 1451(e), the court revoked her citizenship. Munyenyezi's convictions and sentence were affirmed on appeal. United States v. Munyenyezi, 781 F.3d 532 (1st Cir. 2015).

Subsequently, Munyenyezi filed a petition seeking habeas corpus relief, pursuant to 28 U.S.C. § 2255. In it, she asserted that defense counsel provided constitutionally deficient representation; the government failed to disclose exculpatory material prior to trial; and she was entitled to

sentence relief under Johnson v. United States, 135 S. Ct. 2551 (2015). Then, after the Supreme Court issued its opinion in Maslenjak v. United States, 137 S. Ct. 1918 (2017), Munyenyezi amended her petition to allege an additional ground for habeas relief: that the jury had been improperly instructed on the element of "materiality." The court denied Munyenyezi's habeas petition, concluding that she was not denied effective assistance of counsel, and neither her Brady claim nor her Johnson claim had merit. It did not specifically discuss her Maslenjak claim regarding the allegedly defective jury instructions on materiality.

Munyenyezi sought, and obtained, a certificate of appealability as to one issue: whether "the jury was given inaccurate instructions on her criminal liability" under Maslenjak. The court of appeals vacated the judgment denying Munyenyezi's habeas petition and remanded the matter so this court might "address petitioner's Maslenjak claim in the first instance." Judgment of the Court of Appeals (document no. 19) at 1.

For the reasons discussed, the court concludes that Munyenyezi is not entitled to habeas relief on the grounds asserted and, therefore, her petition is denied.

**Discussion**

I.   <u>Background</u>.

Beatrice Munyenyezi is a Hutu from Rwanda. The factual background describing her involvement in the 1994 Rwandan genocide - during which Hutus murdered hundreds of thousands of Tutsis - is set forth in the court of appeals' decision. <u>See</u> <u>United States v. Munyenyezi</u>, 781 F.3d 532 (2015). By way of background, the court observed that:

> Over the course of 100 days, roving bands of Hutus (Rwanda's majority ethnic group) slaughtered hundreds of thousands of their countrymen, most of them Tutsis (a minority group long-dominant in Rwanda). Some of the crazed killers belonged to the Interahamwe, the dreaded militia of a Hutu political party known by the initials, MRND. About 7,000 Rwandans died each day, often butchered by machete-wielding Interahamwes at roadblocks set up to catch fleeing Tutsis. And these killers didn't just kill - they raped, tortured, and disfigured too.

<u>Id</u>. at 535. The evidence at trial overwhelmingly established, beyond any reasonable doubt, that Munyenyezi was associated with the National Republican Movement for Democracy and Development, also known as the "MRND," and that she oversaw one of the infamous roadblocks at which so many Tutsi's were murdered. As noted by the court of appeals,

> [Vestine Nyiraminani] testified that in April 1994 she and her sister got stopped at the roadblock near the Hotel Ihuriro. . . . Seeing that their cards identified them as Tutsis, Munyenyezi ordered them to

3

sit at the side of the road with other Tutsis. A half
hour later, soldiers marched them into the woods. One
of the thugs then plunged a knife into Nyiraminani's
sister's head. Nyiraminani escaped. But she never
saw her sister again.

Jean Paul Rutaganda testified about a time in April
1994 when (as a 15 year old) he and some other Tutsis
hid at an Episcopal school near the Hotel Ihuriro.
Rutaganda spotted Munyenyezi (he knew her by name) at
the roadblock with Interahamwes, wearing an MRND
uniform, asking for identity cards, and writing in a
notebook. "She was counting," Rutaganda said,
"registering dead Tutsis and others who were not yet
dead." Tutsis, he added, "were killed day and night"
in the nearby forest - something he knew from the
"screaming" and the "crying."

Tutsi Consolee Mukeshimana also saw Munyenyezi around
this time. Mukeshimana had seen her before (at
Mukeshimana's sister's house). And at the roadblock
Mukeshimana watched a fatigues-wearing Munyenyezi
check IDs and lead Tutsis to other "Interahamwe so
they could get killed."

Desperate to leave Butare because of the killing,
Tutsi Vincent Sibomana tried to run but got detained
at the roadblock. Munyenyezi asked for an ID. He
knew who she was because he had seen her buy beer at a
store where he had worked. And he had also seen an
MRND-shirt-wearing Munyenyezi walking around Butare.
Anyhow, Sibomana was too young to have an ID card,
apparently (he was only 14). An irate Interahamwe hit
his head with a rifle butt. And he fell into a ditch.
More Tutsis were there. "Beatrice" - to quote
Sibomana's testimony - then told the other
Interahamwes to "kill" them all. Sibomana bolted.
But he saw and heard Tutsis "being killed," hacked by
"machetes" and bludgeoned with "clubs."

Id. at 537. See also Id. at 538 ("[D]ressed as an Interahamwe,

she personally inspected IDs at the checkpoint, separated those

4

who would live from those who would die (and die gruesomely),
and kept records of the ghastly going-ons.").

It was also established at trial - again, beyond any
reasonable doubt - that Munyenyezi lied (repeatedly) on various
documents that she submitted in support of her application for
entry into the country as a refugee, including the "Rwandan
Questionnaire"[1] for visa applicants, her application for
permanent residence, and, most importantly for present purposes,
her application for naturalization.  The government also
established that Munyenyezi lied to immigration officials to
conceal her participation, both directly and as an aider and
abettor, in kidnapping, false imprisonment, rape, and murder -
all in connection with the 1994 Rwandan genocide.

At issue is Munyenyezi's conviction on Count One of the
indictment, which charged her with having knowingly procured her
naturalization contrary to law - that is, by knowingly providing
false information as to <u>material</u> facts in her Application for
Naturalization, Form N-400 – in violation of 18 U.S.C. §

---

[1]   In the wake of the genocide, United States immigration
officials prepared (and employed) the so-called "Rwandan
Questionnaire" in an effort to help determine which visa and
refugee applicants may have participated in the genocide.  <u>See
generally</u> Testimony of Donald Heflin, Trial Transcript, Day 6
(document no. 285) at 7-18.

1425(a). In her amended petition seeking habeas corpus relief, Munyenyezi asserts that the jury was improperly instructed on the definition of "material" and, therefore, her conviction on Count One must be overturned and a new trial ordered. See Amended Petition (document no. 11) at 3.[2]

II. Maslenjak, Section 1425(a), and "Materiality"

Like Beatrice Munyenyezi, Divna Maslenjak was convicted of having procured her naturalization contrary to law, in violation of 18 U.S.C. § 1425(a) - that is, by having provided false statements to immigration authorities, in violation of 18 U.S.C. § 1001. At Maslenjak's trial, the trial judge instructed the jury that conviction was proper so long as the government "proved that one of the defendant's statements was false - even if the statement was not 'material' and 'did not influence the decision to approve her naturalization.'" Maslenjak, 137 S. Ct.

---

[2] The government asserts that Munyenyezi's conviction on Count Two of the indictment - that is, having unlawfully obtained naturalization in violation of 18 U.S.C. § 1425(b) - is not implicated by the Maslenjak decision. Munyenyezi disagrees, asserting that it is possible that the jury convicted her on Count Two based upon her materially false statements to immigration authorities (and not because she otherwise lacked "good moral character"). Consequently, she says the jury should have been instructed on Maslenjak's "causality" element of materiality. Even assuming Munyenyezi's conviction on Count Two is implicated by Maslenjak, it does not alter the court's analysis or its conclusion that any error in the jury instructions under the later-decided Maslenjak case was harmless beyond a reasonable doubt.

at 1924.  On appeal, the Supreme Court considered a fairly simple and straightforward question: whether "a naturalized American citizen can be stripped of her citizenship in a criminal proceeding based on an immaterial false statement." Id. at 1932 (Alito, J. concurring) (quoting Petition for Certiorari).

Unsurprisingly, the Court answered that question in the negative.  To obtain a conviction under section 1425(a) based upon a false statement, the government must prove the false statement to immigration authorities was "material."  But, in so doing, the Court arguably created a more demanding definition of "materiality" than had previously been thought to apply.

Before Maslenjak, the Court had explained that, "It has never been the test of materiality that the misrepresentation or concealment would more likely than not have produced an erroneous decision, or even that it would more likely than not have triggered an investigation."  Kungys v. United States, 485 U.S. 759, 771 (1988) (emphasis in original).  Accordingly the Court held that:

> We think it safer in the naturalization context, as elsewhere, to fix as our guide the central object of the inquiry: whether the misrepresentation or concealment was predictably capable of affecting,

>  <u>i.e.</u>, had a natural tendency to affect, the official
> decision.  The official decision in question, of
> course, is whether the applicant meets the
> requirements for citizenship, so that the test more
> specifically is whether the misrepresentation or
> concealment had a natural tendency to produce the
> conclusion that the applicant was qualified.
>
> * * *
>
> We hold, therefore, that the test of whether Kungys'
> concealments or misrepresentations were material is
> whether they had a <u>natural tendency to influence the
> decisions of the Immigration and Naturalization
> Service</u>.

<u>Kungys</u>, 485 U.S. at 771-72 (emphasis supplied).

The <u>Maslenjak</u> Court did not expressly overrule, or even question, the opinion in <u>Kungys</u>.  Indeed, in explaining the "materiality" requirement of section 1425(a), the Court repeatedly relied upon the <u>Kungys</u> opinion (and the concurring opinions of various justices who agreed with the outcome of <u>Kungys</u>).  And, yet, the two opinions are difficult to reconcile. Under <u>Maslenjak</u>, a false statement is "material" only if (1) it concealed a fact that was so significant that it would have immediately disqualified the applicant for naturalization, or (2) the misrepresented fact:

> was sufficiently relevant to one or another
> naturalization criterion that <u>it would have prompted
> reasonable officials</u>, seeking only evidence concerning
> citizenship qualifications, <u>to undertake further
> investigation</u>.  If that much is true, the inquiry

8

> turns to the prospect that such an investigation would
> have borne disqualifying fruit. As to that second
> link in the causal chain, the Government need not show
> definitively that its investigation would have
> unearthed a disqualifying fact (though, of course, it
> may). Rather, the Government need only establish that
> the investigation "would predictably have disclosed"
> some legal disqualification.

Maslenjak, 137 S. Ct. at 1929 (emphasis supplied). It would seem, then, that if a misstatement did not conceal an immediately disqualifying fact, the government must prove that, had the applicant been truthful, the government would have undertaken further investigation and that investigation "would predictably have disclosed" a disqualifying fact. That language is difficult to reconcile with the statement in Kungys, quoted above, that "It has never been the test of materiality that the misrepresentation or concealment would . . . . more likely than not have triggered an investigation." Kungys, 485 U.S. at 771 (emphasis in original).[3]

Nevertheless, while the precise impact of Maslenjak may be somewhat unclear (say, in prosecutions under 18 U.S.C. § 1001), this much can be said with relative confidence: in order to

---

[3] The Court's opinion in Kungys is, to be sure, "maddeningly fractured." United States v. Latchin, 554 F.3d 709, 713 (7th Cir. 2009) (attempting to summarize the holding of the majority of justices in Kungys). Maslenjak, then, should be read as clarifying Kungys.

9

convict a defendant for violating 18 U.S.C. § 1425(a) by having provided false statements, <u>Maslenjak</u> requires the jury to find a direct causal connection between the defendant's false statement(s) and the awarding of his or her naturalization. In such prosecutions, a false statement that could have had "a natural tendency to influence" the decisionmaker is not, it would seem, sufficient. Rather, the facts misrepresented by the defendant either must have themselves been disqualifying, <u>or</u> the government must demonstrate that, had the facts not been misstated, reasonable officials would have undertaken further investigation which, in turn, would "predictably have disclosed" defendant's ineligibility for citizenship. <u>Maslenjak</u>, 137 S. Ct. at 1929. <u>See also</u> <u>Id</u>. at 1923.

III. <u>The Jury Instructions at Issue</u>.

In its instructions to Munyenyezi's jury, the court instructed that one of the essential elements of Court One, which the government must prove beyond a reasonable doubt, is that "the defendant knowingly and intentionally provided materially false statements on her Application for Naturalization, Form N-400." Jury Instructions, <u>United States v. Munyenyezi</u>. No. 10-cr-85-SM (document no. 110), at 18. With regard to the "materiality" element, the court instructed the jury as follows:

> A statement is "material" if it has a natural tendency
> to influence or to be capable of influencing the
> decision of the decisionmaker to which it was
> addressed.  So, in this case, a false statement is
> "material" if the statement would have warranted a
> denial or citizenship, <u>or the statement had a natural
> tendency to influence, or was capable of influencing
> the decision of a government agency in making a
> determination required to be made</u>.

Id. at 21.  While the highlighted portion of the instruction is consistent with the Supreme Court's then-controlling opinion in Kungys, it arguably falls short of explaining to the jury the more significant causality requirement imposed by Maslenjak. The court therefore assumes, for purposes of resolving this petition, that its "materiality" instruction to the jury was deficient under Maslenjak's requirements.

But, that does not end the inquiry.  That the jury was erroneously instructed on the materiality element does not automatically entitle Munyenyezi to the habeas relief she seeks. If that error was "harmless" and Munyenyezi was not prejudiced, her conviction under 18 U.S.C. § 1425(a) must stand.

IV. <u>The Erroneous Instruction on "Materiality" was Harmless</u>.

First, and perhaps most fundamentally, the erroneous jury instruction about which Munyenyezi complains was not a "structural error" that would require automatic reversal of her

conviction. That is, the error did not render her trial "fundamentally unfair," as the Supreme Court has defined that phrase.

> We have recognized that most constitutional errors can be harmless. If the defendant had counsel and was tried by an impartial adjudicator, there is a strong presumption that any other constitutional errors that may have occurred are subject to harmless-error analysis. Indeed, we have found an error to be "structural," and thus subject to automatic reversal, only in a very limited class of cases [listed examples omitted].
>
> The error at issue here - <u>a jury instruction that omits an element of the offense</u> - differs markedly from the constitutional violations we have found to defy harmless-error review. Those cases, we have explained, contain a defect affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself. Such errors infect the entire trial process, and necessarily render a trial fundamentally unfair. Put another way, these errors deprive defendants of basic protections without which a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence and no criminal punishment may be regarded as fundamentally fair.
>
> Unlike such defects as the complete deprivation of counsel or trial before a biased judge, an instruction that omits an element of the offense does not necessarily render a criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence.

<u>Neder v. United States</u>, 527 U.S. 1, 8-9 (1999) (punctuation and citations omitted) (emphasis supplied).

The question presented, then, is whether the error at issue requires correction. It does not. The lack of a complete instruction on "materiality" consistent with the Court's opinion in Maslenjak was "harmless" insofar as it is clear "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." Chapman v. California, 386 U.S. 18, 24 (1967). See also Delaware v. Van Arsdall, 475 U.S. 673, 681 (1986) ("[A]n otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the record as a whole, that the constitutional error was harmless beyond a reasonable doubt."). Cf. Fry v. Pliler, 551 U.S. 112, 116 (2007) (holding that on collateral (habeas) review of a state court conviction, the proper standard by which to assess constitutional error is the more lenient one articulated in Brecht v. Abrahamson, 507 U.S. 619 (1993) - that is, whether the error "had substantial and injurious effect or influence in determining the jury's verdict" - and not Chapman's more demanding "harmless beyond a reasonable doubt" standard).

Count One of the indictment charged Munyenyezi with having made at least five specific, material, false statements on her Application for Naturalization, Form N-400. And, the jury was instructed that, before it could convict Munyenyezi of the crime charged in Count One, each juror must agree that she made at

13

least one particular false statement. "By that I mean the following: it is not sufficient if you all agree that the defendant made some false statement, but cannot agree on which one. Instead, before you may convict the defendant of the crime charged in count one, you must all agree with regard to which specific false statement(s) the government has proved beyond a reasonable doubt." Jury Instructions (document no. 110) at 20.

The jury returned a general verdict. Nevertheless, it is undeniable that the jury unanimously concluded, beyond a reasonable doubt, that Munyenyezi made <u>at least one</u> of the false statements identified in the indictment - that is:

> Question one: Munyenyezi lied when she denied membership in, or association with, any association, foundation, or party and failed to disclose her membership in, or association with, the MRND and Interahamwe;
>
> Question two: Munyenyezi lied when she denied having ever persecuted any person because of race, religion, national origin, or membership in a particular group and failed to disclose her direct and indirect persecution of Tutsis during the Rwandan genocide;
>
> Question three: Munyenyezi lied when she denied having ever committed a crime and failed to disclose her participation in genocide, murder, rape, and kidnapping;
>
> Question four: Munyenyezi lied when she denied having ever given false or misleading information to any U.S. official while applying for any immigration benefit and failed to disclose her prior lies on, among other documents, the Rwandan Questionnaire; and/or

14

> Question five: Munyenyezi lied when she denied having
> ever lied to any U.S. official to gain entry or
> admission into the United States and failed to
> disclose her prior lies on, among other documents, the
> Rwandan Questionnaire.

Given the evidence introduced at trial, as well as the findings the jury necessarily had to have made, it is plain that the now incomplete instruction on "materiality" was harmless beyond a reasonable doubt. Had Munyenyezi answered either question two or question three truthfully - that is, had she acknowledged her persecution of Tutsis and/or revealed her role in genocide, murder, rape, and kidnapping - she would have immediately been deemed ineligible for naturalization. See, e.g., Testimony of Donald Heflin, Trial Transcript, Day 6 (document no. 285) at 14 ("The Immigration and Nationality Act says you can't come to the U.S. if you've committed a crime of moral turpitude, section 212(a)(2). Crimes of moral turpitude include murder or aiding and abetting in murder."). See generally Maslenjak, 137 S. Ct. at 1928-29 ("If the facts the defendant misrepresented are themselves disqualifying, the jury can make quick work of that inquiry. In such a case, there is an obvious causal link between the defendant's lie and her procurement of citizenship. . . . In short, when the defendant misrepresents facts that the law deems incompatible with

15

citizenship, her lie must have played a role in her naturalization.").

Alternatively, if Munyenyezi had answered questions one, four, and/or five truthfully and disclosed her association with the MRND and Interahamwe, as well as her earlier lies on, among other forms, the Rwandan Questionnaire, the government would have, without a doubt, undertaken further investigation that "would predictably have disclosed some legal disqualification," Maslenjak, 137 S. Ct. at 1929 - that is, Munyenyezi's participation in the genocide, her role in the MRND and the operation of the roadblock, and her role in the persecution, rape, and execution of Tutsis. See, e.g., Testimony of Donald Monica, Trial Transcript, Day 4 (document no. 301) at 13-14 (stating that if Munyenyezi had disclosed her membership in the MRND, he would have investigated that matter further); Testimony of Maurice Violo, Trial Transcript, Day 7 (document no. 292) at 57-59, 90 (testifying that if Munyenyezi had disclosed her membership in the MRND, "we would investigate exactly what that was and what her involvement in that organization was."); Testimony of Donald Heflin, Trial Transcript, Day 6 (document no. 285) at 30 (describing membership in the MRND and Interahamwe as a "red flag" that would have resulted in either immediate disqualification or, at a minimum, further

investigation into her role in the organization).  See also Id. at 13 (noting that if a response prompted a yellow or red flag, "We would go back out and ask that more questions be asked, and in some cases we just simply wouldn't be able to issue the visa or the refugee travel documents.  The burden is really on the applicant for a visa or refugee status in these cases.  We have plenty of people who want to come to the U.S.  We can just skip over people that have these kind of problems and take the next person in line.").

In short, then, even assuming the court's instruction on "materiality" fell short of explaining the heightened causality requirements recognized in Maslenjak, that error was, under the circumstances, harmless beyond a reasonable doubt.  Had Munyenyezi truthfully answered any one of the five questions identified in the indictment, her application for naturalization would have been immediately denied or, at a minimum, further investigation into the nature of Munyenyezi's conduct during the genocide would have been conducted.  Such an investigation would have inevitably led to the discovery of what the evidence overwhelmingly established - that Munyenyezi actively participated with the MRND and Interahamwe in perpetrating murder, rape, and kidnapping, as part of the Rwandan genocide.

Finally, the court notes that Munyenyezi did not contest making the (false) statements to immigration authorities, nor did she claim that those statements were immaterial to her eligibility for naturalization. Rather, she asserted that the witnesses against her were either lying or had mistaken her for some other (unidentified) woman who dressed in MRND attire, operated the roadblock outside of Munyenyezi's home, and participated in the genocide. Plainly, the jury rejected those claims. Consequently, the omitted element - a proper instruction on the materiality of the false statements charged - pertained to a matter that was both uncontested and established by proof beyond a reasonable doubt. See generally Neder, 527 U.S. at 17 ("In this situation, where a reviewing court concludes beyond a reasonable doubt that the omitted element was <u>uncontested</u> <u>and</u> <u>supported by overwhelming evidence</u>, such that the jury verdict would have been the same absent the error, the erroneous instruction is properly found to be harmless.") (emphasis supplied); Johnson v. United States, 520 U.S. 461, 470 (1997) (noting that "evidence supporting materiality was overwhelming [and] materiality was essentially uncontroverted at trial," and stating that "On this record there is no basis for concluding that the error [failing to instruct the jury on "materiality"] seriously affected the fairness, integrity or public reputation of judicial proceedings. Indeed, it would be

the reversal of a conviction such as this which would have that effect.  Reversal for error, regardless of its effect on the judgment, encourages litigants to abuse the judicial process and bestirs the public to ridicule it.") (citations and internal punctuation omitted).

Because the court concludes that Munyenyezi's claim fails on the merits, it need not address the government's alternative arguments concerning procedural default and the (generally disfavored) concurrent sentence doctrine.

## Conclusion

Petitioner's Motion to Vacate Sentence under 28 U.S.C. § 2255 (document no. 1, as amended by document no. 11) is denied.

The Clerk of Court shall enter judgment in accordance with this order and close the case.

## Rule 11 Certificate

As the interplay between Kungys and Maslenjak is undeveloped, and resolution of this petition turns on both a construction and application of Maslenjak's causation rules as they inform "materiality," as well as an assessment of the weight of the evidence of guilt presented

at trial, I find that those issues arguably satisfy the petitioner's burden to make a substantial showing of the denial of a constitutional right (28 U.S.C. § 2253(c)(2)), and so warrant the issuance of a certificate of appealability with respect to those issues. <u>See</u> Rule 11, Rules Governing Section 2255 Proceedings.

    **SO ORDERED.**

                                                             Steven J. McAuliffe
                                                             United States District Judge

October 10, 2019

cc:  Richard Guerriero, Esq.
     John A. Capin, AUSA
     Mark Quinlivan, AUSA